# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Ad Associates, Inc., d/b/a
Wide-Area Classifieds,

                Plaintiff,

v.

Coast to Coast Classifieds, Inc.,
and Carol Brennan,

                Defendants.

Civ. No. 04-3418 (RHK/JSM)

**MEMORANDUM OPINION AND ORDER**

Peter M. Lancaster and Heather D. Redmond of Dorsey & Whitney L.L.P., Minneapolis, Minnesota, for Plaintiff.

William Z. Pentelovitch and Dawn C. Van Tassel of Maslon, Edelman, Borman & Brand L.L.P., Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

This matter came on for trial before the undersigned United States District Court Judge without a jury. Based upon the presentations of counsel, including all pre-trial and post-trial submissions, and all evidence submitted by the parties, the Court hereby makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Plaintiff Ad Associates, Inc. ("Ad Associates") and Defendant Coast to Coast Classifieds, Inc. ("Coast to Coast") are Minnesota corporations with offices located in New Ulm, Minnesota. Shannon Frauenholtz is the owner of Ad Associates, and Defendant Carol Brennan is the owner of Coast to Coast. Ad Associates and Coast to Coast are competitors

in the classified advertising brokerage business, in which advertising brokers obtain classified advertising orders and place the advertisements in publications throughout the United States. Publications consider advertising brokers to be their customers, and therefore actively advertise with brokers to ensure the publication's name and contact information are in the public domain. The customers of advertising brokers are individuals who wish to place classified advertisements for a variety of reasons; these include couples looking to adopt, businesses looking to hire, travel and vacation rental companies, and individuals or entities seeking to buy or sell businesses. Customers hire an advertising broker to gain a national audience for their classified advertisement at the lowest possible price.

Prior to forming Coast to Coast, Brennan was an employee of Ad Associates from July 1981 through August 2002. During her employment with Ad Associates, she was an "at-will" employee with no written employment or non-compete agreement. Brennan was never required to sign a confidentiality agreement nor told that any information used by Ad Associates should be kept secret. Customized buys[1] created by Ad Associates were disseminated to hundreds of potential customers in the company's marketing brochure.

---

[1] A "buy" consists of several publications grouped by geographic location and sold for one lump sum. Each buy consists of a different number of publications at a different price. An individual can choose from a variety of standard ("off-the-shelf") and customized buys. Standard buys are put together by local free press organizations, and customized buys are created by advertising brokers.

Computer data, including customer lists and contact information, was never password protected or hidden from computer consultants.

During Brennan's twenty-one years of employment with Ad Associates, the company was owned and operated by Steve Reinhart.  In December 2001, Reinhart was diagnosed with brain cancer.  Following this discovery, future ownership of Ad Associates was uncertain.  Reinhart discussed his business options with Brennan, including the possibility of selling her the business outright or making arrangements to give her a partial ownership interest in the company.  Brennan made a bid to purchase Ad Associates in June 2002, which Reinhart rejected.  Brennan then informed Reinhart that, after working with him for over twenty years, she had no desire to work under a new owner and would resign if he sold the company.  A few weeks later, Reinhart gave Brennan a proposed employment agreement, which contained several new work restrictions, including a non-compete covenant.  Brennan refused to sign the agreement because she had no desire to be bound by the proposed terms.

After unsuccessfully attempting to purchase Ad Associates and rejecting Reinhart's proposed employment agreement, Brennan began preparations to start her own similar and competing business.  On July 3, 2002, she met with a lawyer to discuss forming her own corporation.  On July 15, 2002, Brennan hired a computer consultant to design software and set up a computer system for an advertising brokerage business.  On July 31, 2002, Brennan registered the business name of "Coast to Coast Classifieds" with the Minnesota Secretary of State.

On August 8, 2002, Reinhart informed Brennan that he intended to sell Ad Associates to a third party. True to her word, Brennan immediately resigned. Upon leaving the Ad Associates office, Brennan took her personal belongings, business cards and fax numbers for various publications offering classified advertising, and copies of Ad Associates' marketing brochures. She did not take any customer lists or contact information, marketing or pricing information, computer data, or financial information. Brennan immediately contacted Kathy Cooper, another employee of Ad Associates, and asked Cooper to join her in establishing a new company; Cooper declined the offer.

After resigning from Ad Associates, Brennan began operating Coast to Coast from her home. Brennan's first step to build her business was to create a network of publications across the country. On August 12, 2002, Brennan began sending out informational letters to hundreds of newspapers, magazines and newsletters. Each letter introduced Coast to Coast as a new company, talked about Brennan's prior experience with Ad Associates, and requested contact and advertising rate information. Each communication was sent via facsimile; Brennan admittedly used the fax numbers that she had copied from Ad Associates' records before resigning. The fax numbers were publicly available in the SRDS Media Solutions resource directory, a publication-listing guidebook. Brennan destroyed her copied lists after she faxed out the initial set of solicitations because, according to her testimony, she knew the faxed responses from publications would contain sufficient information for her future purposes.

In late August and early September 2002, Brennan finished creating her network of publications and began sending letters of introduction to potential customers. She found some potential customer names and contact information by scouring newspaper advertisements and searching the internet. After spending twenty-one years working at Ad Associates, Brennan also remembered the names of several of the company's customers, and sought out their contact information to inform them of her new business. Coast to Coast booked its first advertising sale in early September 2002, four weeks after Brennan resigned from Ad Associates. Many of Coast to Coast's new customers had never done business with Ad Associates.

Reinhart's health continued to deteriorate during this time, and in October 2002, he asked his daughter, Shannon Frauenholtz, to join Ad Associates rather than selling the company to a third party. In Brennan's opinion, Ad Associates was never sold to a third party because a successful sale of the company would have required Brennan's continued involvement in the business, with her many years of experience in the industry.

Reinhart died in October 2002. The Reinhart family blamed Brennan for creating undue stress during the final months of Reinhart's life. The feelings of betrayal were such that the Reinhart family lawyer called Brennan and threatened her with arrest if she attended Reinhart's funeral services. Upon Reinhart's death, Frauenholtz became the operations manager of Ad Associates. Although Frauenholtz approached her new position with determination, the company's revenues declined significantly during her first year leading the company.

During its first year of operation, Coast to Coast used a website and an informational flyer to attract potential customers. In July 2003, Coast to Coast published an extensive marketing brochure showcasing all available buys for publications across the country. The blue-colored brochure was sized to fit into a standard business envelope. The front cover featured Coast to Coast's road sign logo and the company's contact information. The inside contained a listing of vendor publications by state or geographic region, as well as an order form.

The Coast to Coast brochure was similar in shape, size, and purpose to a marketing brochure used by Ad Associates, which was published in 2002. The front cover of the Ad Associates green-colored brochure featured a map of the eastern half of the United States and the company's contact information. The inside of the brochure organized vendor publications alphabetically by free weeklies and paid weeklies. The Ad Associates brochure's order form was located on the inside back cover.

On March 9, 2004, a year and a half after Brennan left Ad Associates, Frauenholtz sent her a letter demanding that she return Ad Associates' property, alter Coast to Coast's marketing materials, and cease contact with Ad Associates' customers. On May 25, 2004, Ad Associates registered a copyright for its marketing brochure. On July 27, 2004, almost two years after her resignation, Ad Associates filed this action against Brennan and Coast to Coast alleging three claims: (1) copyright infringement, (2) misappropriation of trade secrets, and (3) unfair competition.

**CONCLUSIONS OF LAW**

**I.     Copyright Infringement**

In order to prevail on its copyright infringement claim, Ad Associates must prove: (1) ownership of a valid copyright, and (2) copying of the copyrighted work by Coast to Coast and Brennan. See Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 941 (8th Cir. 1992). Ad Associates claims that Coast to Coast and Brennan infringed on its copyrighted marketing brochure by creating and distributing a substantially similar document to attract potential customers.

First, Ad Associates must prove the existence and ownership of a valid copyright. Ad Associates registered a copyright on May 25, 2004, which covers the text of its marketing brochure published on June 1, 2002. Although factual information cannot be copyrighted, compilations of data are afforded copyright protection. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991). Ad Associates' marketing brochure qualifies for copyright protection as a compilation. Therefore, the first element of Ad Associates' copyright claim is satisfied.

Second, Ad Associates must prove copying of the copyrighted work by Brennan and Coast to Coast. Because copyright law affords only "thin" protection to factual compilations, a competitor may take "the bulk of factual material from a pre-existing compilation" without infringing on the author's copyright. Schoolhouse, Inc. v. Anderson, 275 F.3d 726, 729-30 (8th Cir. 2002) (citation omitted). "[I]t takes virtually 'extensive verbatim copying' to constitute infringement of a compilation." Id. To show infringement of a compilation, Ad Associates must show that Brennan and Coast to Coast had access to

the copyrighted material and the accused work is substantially similar to the copyrighted work.  See Thimbleberries, Inc. v. C&F Enters., Inc., 142 F. Supp. 2d 1132, 1139 (D. Minn. 2001).  While Brennan did have access to the copyrighted brochure before and after she left employment with Ad Associates, the two marketing brochures are not substantially similar compilations.  Although there are some objective similarities between the two brochures, including size and shape, the two works contain many differences, including artwork, colors, fonts, graphics, and contents.  It is also notable that Coast to Coast's brochure contains more publication groupings or buys than Ad Associates' brochure, which shows that Coast to Coast did not copy Ad Associates' brochure verbatim, but instead researched and developed its own buys.  Furthermore, Brennan, Frauenholtz, and Janelle Anderson, the owner of a competing advertising brokerage business in Wisconsin, testified that most of the groupings of publications or buys are created by free press associations or logically put together by geographic location.  Therefore, Ad Associates has failed to prove a valid claim for copyright infringement.

## II.     Misappropriation of Trade Secrets

Ad Associates claims that Brennan stole trade secrets — specifically customer lists and publication fax numbers — when she left the company and unlawfully used such trade secrets to start up Coast to Coast as a competing business.  To succeed on its claim for misappropriation of trade secrets, Ad Associates must prove both the existence and the misappropriation of a trade secret.  See Minn. Stat. § 325C.01-.08 (2005); Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897 (Minn. 1983).  To establish the

existence of a trade secret, Ad Associates must show that (1) the information is not generally known or readily ascertainable, (2) the information derives independent economic value from secrecy, and (3) reasonable efforts had been made to maintain the information's secrecy.  See Minn. Stat. § 325C.01(5) (2005).

The Court determines that the list of publication fax numbers taken by Brennan from Ad Associates is not a trade secret under Minnesota law.  The contact information for publications is readily ascertainable from many publicly-available sources, including the SRDS directory, does not derive independent economic value from secrecy, and no efforts were made by Ad Associates to specifically maintain the secrecy of publication contact information.

Second, the customer names Brennan remembered and to whom she sent letters after finding corresponding contact information do not qualify as trade secrets under Minnesota law.  Brennan was never told by Reinhart or anyone else at Ad Associates that customer names were confidential.  In addition, Ad Associates cannot credibly argue that Brennan should have erased her memory before going into business for herself.

Finally, Ad Associates' customized publication groupings or buys are not trade secrets.  Publication groupings or customized buys created by Ad Associates are disseminated to hundreds of potential customers in the company's marketing brochure. Clearly, Ad Associates never intended its customized buys to be kept a secret.

Brennan did not take any other tangible items from Ad Associates that might qualify as trade secrets.  Because Ad Associates has not proven the existence of any trade secrets

in Brennan's possession, it has failed to prove a claim for misappropriation of trade secrets.

**III.    Unfair Competition**

Under Minnesota law, "unfair competition is not a tort with specific elements," but rather, "it describes a general category of torts which courts recognize for the protection of commercial interests." Zimmerman Group v. Fairmont Foods of Minn., 882 F. Supp. 892, 895 (D. Minn. 1994), citing Rehabilitation Specialists v. Koering, 404 N.W.2d 301, 305-06 (Minn. Ct. App. 1987). Torts included under the rubric of unfair competition include product disparagement, tortious interference with contractual interests, and improper use of trade secrets. LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1490 (D. Minn. 1996) (citations omitted). The only claim submitted by Ad Associates that falls under the rubric of unfair competition is misappropriation of trade secrets, which, as noted above, is not a viable claim. Therefore, Ad Associates' claim for unfair competition fails.

**IV.    Damages**

Ad Associates is not entitled to damages because it has failed to prove any of its claims in this case. Coast to Coast asks the Court to award it reasonable fees and costs, pursuant to 17 U.S.C. § 505, for having to defend against a maliciously filed copyright infringement claim. While the Court considers some of Defendant's conduct in this case questionable, such as waiting almost two years following Brennan's departure to file this lawsuit and registering a copyright immediately prior to filing this lawsuit, damages under § 505 are not appropriate. See Fogerty v. Fantasy, Inc., 510 U.S. 517, 536 (1994) (the

decision to award attorneys' fees in a copyright action is committed to the district court's broad discretion); <u>Applied Innovations, Inc. v. Regents of the Univ. of Minn.</u>, 876 F.2d 626, 638 (8th Cir. 1989).

## CONCLUSION

Based on Plaintiff's failure to prove any of its claims, **IT IS ORDERED** that Plaintiff's Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 12, 2005          s/Richard H. Kyle
         RICHARD H. KYLE
         United States District Judge